**Elouise Pepion COBELL,
et al., Plaintiffs,**

v.

**Gale A. NORTON, Secretary of the
Interior, et al., Defendants.**

**No. CIV.A. 96–1285(RCL).**

United States District Court,
District of Columbia.

Feb. 5, 2003.

**18**

Keith M. Harper, Lorna K. Babby, Native American Rights Fund, Washington, DC, Dennis Marc Gingold, Washington, DC, Elliott H. Levitas, Kilpatrick Stockton, LLP, Washington, DC, for Plaintiffs.

J. Christopher Kohn, U.S. Dept. of Justice, Commercial Litigation Branch, Ben Franklin Station, Washington, DC, Brian L. Ferrell, U.S. Dept. of Justice, ENRD, Ben Franklin Station, Washington, DC, Mark E. Nagle, Robert Craig Lawrence, Scott Sutherland Harris, U.S. Attorney's Office, Washington, DC, Charles Walter Findlay, III, Ben Franklin Station, Washington, DC, Henry A. Azar, Jr., U.S. Dept. of Justice, Federal Programs Branch, Washington, DC, Seth Brandon Shapiro, Phillip Martin Seligman, Michael John Quinn, U.S. Dept. of Justice, Civil Division/Ben Franklin Station, Washington, DC, Jonathan Brian New, U.S. Dept. of Justice, Civil Division, Federal Programs Branch, Washington, DC, Gino D. Vissicchio, Jennifer R. Rivera, Tracy Lyle Hilmer, U.S. Dept. of Justice, Civil Division, Washington, DC, Sandra Peavler Spooner, David J. Gottesman, Peter Blaze Miller, Cynthia L. Alexander, Mathew J. Fader, John Warshawsky, John J. Siemietkowski, Amalia D. Kessler, U.S. Dept. of Justice, Commercial Litigation Branch, Washington, DC, John Charles Cruden, U.S. Dept. of Justice, Environment & Natural Resources Division, Annandale, VA, John Stemplewicz, U.S. Dept. of Justice, Ben Franklin Station, Civil Division, Washington, DC, John R. Kresse, Timothy E. Curley, U.S. Dept. of Justice, Civil Division–Commercial Litigation Branch, Washington, DC, Dodge Wells, U.S. Dept. of Justice, Washington, DC, Daniel Gordon Jarcho, Herbert Lawrence Fenster, Michael James Bearman, McKenna, Long & Aldridge, LLP, Washington, DC, B. Michael Rauh, Manatt, Phelps & Phillips, LLP, Washington, DC, for Defendants.

### MEMORANDUM AND ORDER

LAMBERTH, District Judge.

This matter comes before the Court on plaintiffs' consolidated motion to compel deposition testimony of Donna Erwin [1698–1] and for sanctions under Rule 37(a)(4)(A) of the Federal Rules of Civil Procedure [1698–2], which was filed on January 2, 2003. Upon consideration of plaintiffs' motions, defendants' opposition thereto,[1] and the applicable law in this case, the Court finds that plaintiffs' motions should be granted.

### I. PROCEDURAL BACKGROUND

On December 9, 2002, plaintiffs noticed the depositions of Acting Special Trustee Donna Erwin and Office of Historical Accounting Director Bert Edwards. Defendants moved for entry of a protective order by this Court to prevent these depositions from proceeding, and the Court heard oral arguments on defendants' motion on December 13. The Court denied the motion, and ordered the depositions of the two Interior Department officials to proceed. During the hearing, defense counsel represented that Erwin would not be in Washington, D.C. during the week of December 20, when her deposition was scheduled to take place:

MR. QUINN: ... Ms. Erwin in particular, I would just note, being [in] Albuquerque, and having the deposition no-

---

1. Defendants have moved to strike plaintiffs' reply brief as untimely filed. The Court concurs with defendants' argument that it was filed in an untimely manner, and it will grant defendants' motion to strike as to plaintiffs' reply brief. The Court has not considered the arguments set forth in plaintiffs' reply brief in its decision on the disposition of the instant motion.

ticed for Washington, D.C., although plaintiffs are seeking one day of deposition, that effectively translates, for all practical purposes, into four days away from the office, two days of round-trip travel to here from Albuquerque, at least a day of preparation for her deposition, and then the deposition day itself.

On these additional grounds, Your Honor, we would urge that the Court grant the protective order. Thank you.

THE COURT: In preparation of the plan, will Ms. Erwin not otherwise be in Washington?

MR. QUINN: I'm sorry, Your Honor. My understanding is that she does not expect to be in Washington at all. That's my understanding.

THE COURT: Before January 6th?

MR. QUINN: Well, the point is, in terms of her work in connection with the plan, she would be working from Albuquerque, and after the plan is submitted she would be freed up for deposition.

THE COURT: And neither of them have any plans to take any leave between now and January 6th?

MR. QUINN: ... Ms. Erwin plans to continue work. My understanding from her is, if—if she can get enough of the plan completed by Christmas day, she would go—take her son to a—some soccer—special soccer recruiting event in Florida until the 30th, and then would return back to the office, and barring—barring the—this is all dependent on how the progress goes on the course of making the plans ready, and in that event she might be working while on the road. As far as I understand, Your Honor, she does not plan to be in Washington, D.C., at all until at least after January 6th.

Transcript of Motions Hearing, Dec. 13, 2002, at 12–14. Based on the representations made by defense counsel, the Court ordered that Erwin's deposition be taken in Albuquerque, New Mexico, where she maintains an office.

However, on December 17, the Court vacated this portion of its order after learning from plaintiffs, during a hearing convened on that date, that Erwin was in fact present in Washington that week to attend a Tribal Task Force Meeting. Defense counsel responded to plaintiffs' assertions that defendants had intentionally misled the Court. Because the representations made by defense counsel lie at the crux of the motions currently pending before the Court, it is necessary to present defense counsel's representations at some length:

MR. PETRIE: ... At the very most, Your Honor, what we have here is an unintentional, inadvertent misunderstanding between what was represented to you last Friday and what Ms. Erwin's plans were regarding this week which were unbeknownst to us at that time last Friday.

Before I proceed, Your Honor, if I may I would like to—so that you can better understand the facts that led up to the representation that was made to [sic] last Friday, I would like to advise you why Michael Quinn is not here addressing this matter today for two reasons that you need to understand.

First, Michael Quinn appeared on behalf of the United States last Friday because I was personally physically present in Denver, Colorado at the time of the hearing.

Second, and this is very important for your understanding, Mr. Quinn, the representations he made to you on Friday were the representations that I made to him. I want that very clearly understood here, okay?

Here is how Ms. Erwin's availability was determined so that you can get the backdrop to this, Your Honor. On December 4th the plaintiffs, Mr. Harper, sent us a letter indicating that they desired to depose Ms. Erwin and in that letter they indicated the dates of December 12th and 13th. On December 6th, two days later, Friday the 6th, I responded by letter back to Mr. Harper indicating that Ms. Erwin, as well as another deponent they had requested, Mr. Edwards, would not be available.

On the following Monday, December 9th, the plaintiffs then issued noticed depositions for Ms. Erwin as well as Mr. Edwards. The dates were a little bit different, at least specifically regarding Ms. Erwin. Whereas the letter of the 4th of December said the 12th and the 13th, the noticed deposition of the 9th indicated that they wanted to depose her on December 20th.

Two days later, on Wednesday the 11th, we filed a motion for a protective order, and then we've had the hearing this past Friday. So that's the backdrop.

I want to also educate you a little bit about the communications that transpired between myself and Ms. Erwin and Singer, who is sitting there next to Ms. Erwin. Ms. Singer is an attorney from the Solicitor's Office, and she's been detailed to work with Mr. Erwin at this point in time, and she's been present out in Albuquerque where Ms. Erwin's offices are.

Upon receiving the December 4th letter from Mr. Harper, at that point I then called the offices of Ms. Erwin, and is always the case when I attempt to reach Ms. Erwin, she's an extremely busy woman. I mean, even this morning when I went over to Interior she had already was in attendance at a meeting that started at 7:30, and as I commented to her as we ultimately left the Interior building this morning on our way over here, that was quite a feat. I had to arrange for another individual to go to the meeting, interrupt it and extract her because she was late in getting out of the meeting, and we wanted to be here on time. The scene that then unfolded, Your Honor, was very illuminating. I mean, we had one assistant calling on a cell phone for two other people within the building to meet us at the elevators, and then she proceeded to have conversations with those two gentlemen all the way down to the street and into the taxi. She's incredibly busy. I know that last night as I attempted to reach her, as well as Ms. Singer, she was having meetings that started as late as 7:30 last night.

So the result of that is, is that typically when I call for Ms. Erwin and have left her voice mail messages, the person that ends up typically handling the conversation with me is Ms. Singer. Who knows what Ms. Erwin's schedule is.

So after Mr. Harper sent the letter on the 4th of December, I contacted Ms. Erwin's office and spoke with, by my understanding, my recollection, both ladies to ascertain what her availability was and so forth, as well as Mr. Edwards' office, both himself and another attorney from the Solicitor's Office I contacted as well to discuss this with. And as a result of my understanding from those conversations with them, before we filed the letter in response to Mr. Harper on the 6th, I came away with an understanding as to how busy she was and what her schedule was going to require her to do to be able to meet her role, her responsibilities in the plans that are due to the Court on January 6th.

Since that point in time, that initial contact which occurred with them, I have had, through last Friday, the 13th, conversations with that office every day, usually multiple conversations. The point to those conversations were several-fold. One, to keep Ms. Erwin apprised of what was happening in what was at that point a fairly fast-moving train regarding whether or not she was going to be deposed on the 20th, which culminated in the hearing on the 13th. Many times we left voice mail messages, and that included over the weekend of the 7th and 8th as well. The reason for that is, as I said, precisely that. My understanding, as an officer of the Court, from my conversations with Ms. Erwin and Ms. Singer was that she is extremely tied up in meetings every day, and, frankly, there was no indication that she was going to be traveling this week.

Now, obviously, the news that Mr. Gingold shared with you a minute ago

about how she came to be in D.C. was a news—was news to [me] yesterday when I heard it. My understanding since, having spoken with Ms. Singer and briefly with Ms. Erwin because, again, yesterday true to form she was tied up in meetings from early—well, actually, she flew in from Albuquerque yesterday and so forth. My understanding about how she came to be here is that a tribal task force meeting was scheduled. At the time it was scheduled it was her intention to attend that meeting which started yesterday and is to conclude today; that she made plans to travel, and then the information came about the noticed deposition on the 20th; that her outlook at that point was that she was going to wait and see what came out of the hearing last Friday. If the Court was going to require her to be deposed in Washington, D.C. on the 20th, then my understanding is that she would then not attend the tribal task force meetings starting yesterday and today with a caveat. My understanding is that the Secretary wanted her to attend, and she would have to necessarily coordinate with the Secretary if in fact she was ultimately not going to attend the tribal task force meeting. But her understanding at that point was that as of Friday, this past Friday, was that if the deposition of herself was to occur in Washington, D.C. on the 20th, then she was not going to attend the tribal task force meetings starting yesterday, continuing through today. The reason for that is a judgement call on her part because of all the multiple balls that she has in the air now trying to get these plans ready and presented to the Court on January 6th, and if she was to be deposed in Washington, D.C. on the 20th, then she did not want to be out of the office for the entire week because there are meetings that started this past Monday on an important subject matter that's part of the plans and—

THE COURT: If those true facts as you now state them had been disclosed to me, there's no question I could have set her date for deposition for Wednesday,

or for Tuesday, or for some other day. Those facts were not disclosed to me.

MR. PETRIE: Fully agree, Your Honor, and the point I am trying to respectfully convey to you is that I was not aware of that until yesterday morning when the news arrived that she was in fact here in Washington, D.C., and then attempted to—

THE COURT: And notice to you came from the plaintiffs, not from your client?

MR. PETRIE: The news that she was here in Washington, D.C. came via Mr. Harper.

THE COURT: Isn't that astonishing?

MR. PETRIE: Your Honor, on one level—

THE COURT: And troubling to the Court.

Transcript of Motions Hearing, Dec. 17, 2002, at 5–11. The Court then inquired of defense counsel whether the scenario he had just described represented a deliberate attempt to mislead the Court:

MR. PETRIE: No, it is not, Your Honor.

THE COURT: Why not?

MR. PETRIE: It is not—

THE COURT: She knew she was going to come to Washington and go back to Albuquerque, and she let you and Mr. Quinn make contrary representations to the Court.

MR. PETRIE: Your Honor—

THE COURT: How could that not be a deliberate attempt to deceive the Court?

MR. PETRIE: Your Honor, I respectfully disagree because my understanding from Ms. Erwin and Ms. Singer is that it really was not the focus of their understanding of what was transpiring in court; rather their focus, their understanding was the notion of whether or not she was to be deposed before January 6th. So the dialogue as they understand it between themselves and myself was focused upon how busy she was, conveying to myself how busy she was day in, day out, the lengths she was having to do, meetings starting at 6 o'clock in the morning and so forth.

*Id.* at 12–13. But the Court was informed that prior to the December 13 hearing, Erwin had, in fact, made reservations to come to Washington, D.C. on December 16:

> THE COURT: When did she make this airline reservation? When are the tickets dated?
>
> MR. PETRIE: May I ask Ms. Erwin?
>
> THE COURT: Before Friday, I'm sure.
>
> \* \* \* \* \* \*
>
> MS. ERWIN: They were made before Friday, and we told everyone, me and my secretary, to put them on hold until we knew where we were going to do the deposition.

*Id.* at 14–15. This information directly contradicted the following representation of defense counsel during the December 13 hearing: "My understanding is that she does not expect to be in Washington at all."

At the end of the hearing, the Court ordered Erwin's deposition to take place in Washington, D.C. On December 20, plaintiffs deposed Erwin. Towards the end of the deposition, the following line of questioning occurred:

> MR BROWN: You were present in Court on December 17 at a hearing, do you remember that hearing?
>
> THE WITNESS: Yes.
>
> MR. BROWN: As you left this Court you said something to the effect that I'm not going to take this any more. What were you referring to?
>
> THE WITNESS: Concerns regarding the outcome of the hearing.
>
> MR. BROWN: Could you explain that a little more? Let the record reflect there's a conference between counsel and client.
>
> (Off the record.)
>
> THE WITNESS: I felt that the Court had perceived that I had been less than truthful and felt that was not an accurate depiction.
>
> By MR. BROWN: Because you had been fully truthful with your attorneys?
>
> MS. SPOONER: You can answer that.
>
> THE WITNESS: Yes.

> By MR. BROWN: And you believe your attorneys have been fully truthful with the Court?
>
> MS. SPOONER: I'm going to object to that on the grounds that it's protected by the attorney-client privilege.
>
> MR. BROWN: It can't possibly be.
>
> MS. SPOONER: It's her belief she has about her attorneys. It's not whether her attorney said—
>
> \* \* \* \* \* \*
>
> MS. SPOONER: .... I'm objecting on the ground that it is protected by the attorney-client privilege and I'm instructing the witness not to answer.
>
> MR. KIEFFER: You want a ruling? I say she can answer as to her belief. But if she's being directed not to answer, I take it Ms. Erwin, you're not going to answer, is that correct?
>
> THE WITNESS: I don't want to answer that right now. Thank you.
>
> MR. KIEFFER: You don't want to answer, but can you distinguish your belief from any discussion you're had with your attorneys? Any reason you have for not answering that question about whether your attorneys, I don't want to mischaracterize Mr. Brown's question.
>
> \* \* \* \* \* \*
>
> MR. KIEFFER: How do you know her belief is based on her discussions and not just the conduct of her attorneys?
>
> MS. SPOONER: Because I've discussed it with her and she's discussed it with me.

Transcript of Deposition of Donna Erwin, December 20, 2002, at 283–84, 284–85, 286 ("Erwin Dep."). Because of the repeated objections of defense counsel, the deposition ended without Erwin providing an answer to the question.

Plaintiffs argue that defense counsel's assertion of the attorney-client privilege was meritless, and seek to compel Erwin to answer the question directed to her. In the event that the Court grants its motion to compel, plaintiffs seek an imposition of sanctions against defense counsel under Federal Rule of Civil Procedure 37(a)(4)(A) for as-

serting an objection that was not substantially justified.

## II. LEGAL ANALYSIS

### A. Motion to Compel

"A motion to compel a witness to answer questions put at a deposition should be granted if the questions are relevant and proper and denied if the questions call for privileged information." 8A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2286 (2d ed.1994). The Court will examine defendants' assertion of privilege, as well as examine whether the question put to Erwin was both relevant and appropriate.

#### 1. Attorney–Client Privilege

■ "The attorney-client privilege protects confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services." *In re Lindsey*, 148 F.3d 1100, 1103 (D.C.Cir.1998). The party that asserts the existence of the attorney-client privilege possesses the burden of demonstrating its applicability. *Federal Trade Commission v. TRW, Inc.*, 628 F.2d 207, 213 (D.C.Cir.1980). Not only the privileged relationship but all essential elements of the privilege must be shown "by competent evidence and cannot be 'discharged by mere conclusory or ipse dixit assertions.'" *See Martin v. Valley National Bank of Arizona*, 140 F.R.D. 291, 302 (S.D.N.Y.1991) (internal citation omitted). Additionally, "because of the privilege's adverse effect on the full disclosure of the truth, it must be narrowly construed." *In re Grand Jury Investigation of Ocean Transportation*, 604 F.2d 672, 675 (D.C.Cir.1979) (citation omitted).

■ The Court finds that defendants have failed to discharge their burden of demonstrating that the attorney-client privilege prevented Erwin from answering the question asked by plaintiffs' counsel. The question at issue took various forms, but it may be paraphrased as "To your knowledge, did government counsel make any misrepresentations to the Court during the December 17 hearing?" [2] The Court is unable to discern how an answer of "yes" or "no" to this simple factual question would reveal the contents of any confidential communications between Erwin and defense counsel made for the purpose of securing legal advice or services.

Nor, if Erwin had answered in the affirmative, would any followup question about the nature of misrepresentations made to the Court reveal any confidential communications made between Erwin and defense counsel for the purpose of securing legal advice or services. During the December 17 hearing, defense counsel described the substance of three communications or series of communications between Erwin and himself:

(1) When he received plaintiffs' December 4 letter, he spoke with both Erwin and Singer. The subject of the conversation was "to ascertain what [Erwin's] availability was and so forth." Counsel "came away [from this conversation] with an understanding as to how busy she was and what her schedule was going to require her to do to be able to meet her role, [and] her responsibilities in the plans that are due to the Court on January 6th."

(2) After this "initial contact" until December 13, counsel had "multiple conversations" with Erwin's office "every day." The purpose of these conversations was "to keep Ms. Erwin apprised of what was happening ... regarding

---

**2.** The question was variously phrased:
"You've sat in that courtroom. You heard what was represented to the Court by your attorneys. Were those representations accurate?" Erwin Dep. at 286.
"Do you believe the Justice Department made misrepresentations in Court in the hearing you attended in anything they said?" *Id.* at 291.
"Do you believe the Justice Department counsel made misrepresentations concerning your availability to come to Washington, D.C.?" *Id.*

"Did the Department of Justice make a misrepresentation to the Court, in your opinion, based upon what you heard in Court, when you were present on the 17th? ... As to your availability for deposition in Washington, D.C.?" *Id.* at 294–95.
"When you were sitting in that courtroom, at the end of the hearing, did you have an opinion, yes or no, as to whether or not the Department of Justice was making a misrepresentation to the Court on any subject?" *Id.* at 295–96.

whether or not she was going to be deposed on the 20th, which culminated in the hearing on the 13th."

(3) On December 16, defense counsel spoke "briefly with Ms. Erwin." During this conversation, counsel learned that "[a]t the time [the tribal task force meeting] was scheduled it was [Erwin's] intention to attend that meeting . . .; that she made plans to travel, and then the information came about the noticed deposition on the 20th; [and] that her outlook at that point was that she was going to wait and see what came out of the hearing last Friday." Erwin allegedly stated that "[i]f the Court was going to require her to be deposed in Washington, D.C. on the 20th, then . . . she would then not attend the tribal task force meetings . . . with a caveat. . . . [T]he Secretary wanted her to attend, and she would have to necessarily coordinate with the Secretary if in fact she was ultimately not going to attend the tribal task force meeting. But her understanding . . . as of . . . this past Friday, was that if the deposition of herself was to occur in Washington, D.C. on the 20th, then she was not going to attend the tribal task force meetings . . . [I]f she was to be deposed in Washington, D.C. on the 20th, then she did not want to be out of the office for the entire week because there are meetings that started this past Monday on an important subject matter that's part of the plans[.]"

■ An answer from Erwin about whether defense counsel's description of these conversations was truthful would necessarily entail a discussion of these conversations. Therefore, the question is whether these conversations were (1) confidential and (2) made for the purpose of securing legal advice or services. *See Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.,* 5 F.3d 1508, 1514 (D.C.Cir.1993) ("[The D.C. Circuit has] stressed that the critical factor for purposes of the attorney-client privilege was that the communication be made *'in confidence* for the purpose of obtaining *legal* advice *from the lawyer.'* ")

(quoting *FTC v. TRW, Inc.,* 628 F.2d 207, 212 (D.C.Cir.1980)) (emphasis in original); *Schlefer v. United States,* 702 F.2d 233, 245 (D.C.Cir.1983) ("The privilege operates when 1) the communication from attorney to client is confidential, and 2) the communication is based on confidential information provided by the client.").

There is nothing in defense counsel's descriptions of his communications with Erwin to suggest that these communications were made for the purpose of obtaining legal advice or services. According to defense counsel, the subjects of these conversations were Erwin's schedule during the month of December, and her availability for a deposition by plaintiffs. Because "a statement betraying neither interest in, nor pursuit of, legal counsel bears only the most attenuated nexus to the attorney-client relationship and thus does not come within the ambit of the privilege," the Court concludes that these communications are not privileged. *Linde Thomson,* 5 F.3d at 1515.

■ In addition to the fact that these communications did not include obtaining legal advice, they have not remained confidential. Defense counsel destroyed any semblance of confidentiality that may have attached to these conversations during the December 17 hearing when he described for the Court the time, manner, and substance of these conversations. The case law in this Circuit is clear that confidentiality does not survive such a disclosure to a third party— to say nothing of disclosure in open court. *See In re Sealed Case,* 877 F.2d 976, 980 (D.C.Cir.1989) ("Although the attorney-client privilege is of ancient lineage and continuing importance, the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant. We therefore agree with those courts which have held that the privilege is lost even if the disclosure is inadvertent.") (internal quotations and citations omitted); *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 863 (D.C.Cir.1980) ("[A] fundamental prerequisite to assertion

of the privilege [is] confidentiality both at the time of the communication and maintained since. The burden is on the agency to demonstrate that confidentiality was expected in the handling of these communications, and that it was reasonably careful to keep this confidential information protected from general disclosure."); *Mead Data Central v. U.S. Dep't of the Air Force*, 566 F.2d 242, 253 (D.C.Cir.1977) ("The privilege does not allow the withholding of documents simply because they are the product of an attorney-client relationship, however. It must also be demonstrated that the *information is confidential.* If the information has been or is later shared with third parties, the privilege does not apply."). Moreover, "a waiver of the privilege in an attorney-client communication extends 'to all other communications relating to the same subject matter.'" *In re Sealed Case*, 877 F.2d at 980–81 (quoting *In re Sealed Case*, 676 F.2d 793, 809 (D.C.Cir.1982)). Accordingly, any communications made between Erwin and defense counsel regarding her December schedule or her availability to be deposed in the month of December fall outside of the scope of the attorney-client privilege.

### 2. Relevance

■ Defendants also argue that the question propounded to Erwin was irrelevant, asserting that the scope of depositions "certainly must be limited to matters to be decided in Trial 1.5, which do not include Ms. Erwin's scheduling issues." Defs.' Opp. Br. at 13. However, defendants concede that "relevancy was not the specific basis asserted by Government counsel during the deposition[.]" *Id.* at 12. Accordingly, defendants waived this objection when they failed to assert it in a timely manner. Nevertheless, in responding to a motion to compel, it is appropriate for the Court to determine whether the question at issue sought relevant information.

■ The Court finds troubling defendants' assertion that it is irrelevant whether or not their counsel may have lied to the Court during a formal hearing. The Court is also surprised to hear defendants claim that a question that directly bears on the credibility of a key witness in the Phase 1.5 Trial is irrelevant. Whether or not Donna Erwin permitted factual misrepresentations to be made to the Court on her behalf is an issue that directly affects the credibility of her testimony as a witness.[3]

What the Court finds most disturbing, however, is defendants' assertion that plaintiffs' question was irrelevant because "[t]he scope of Ms. Erwin's deposition was properly limited to the January 6 Plans." *Id.* at 13. Defendants also note that "at the beginning of Ms. Erwin's deposition, Government counsel reminded Plaintiffs' counsel that the deposition had been ordered based on such representations to the Court." *Id.* Indeed, before the deposition commenced, defense counsel made the following announcement:

> MS. SPOONER: ... we expect that this deposition will be limited to the basis on which the judge allowed this deposition to go forward prior to January 6, and that is that the plaintiffs need facts, information from Ms. Erwin on which to base their own plan, and that this is not discovery into any plan that the Interior Department may be preparing or may ultimately submit.
>
> Accordingly, we will place a standing objection as to any questions relating to Interior's plan, as opposed to facts that go to the creation of plaintiffs' plans.

Erwin Dep. at 6–7. The Special Master–Monitor responded to this announcement:

> MR. KIEFFER: I should put on the record that Mr. Harper's statement or any

3. As noted above, prior to the December 13 hearing, Erwin had made airline reservations to travel to Washington and attend the Tribal Task Force Meeting. Therefore, there are only two possible reasons why the Court was not informed of her plans to be in Washington during the week of December 17. The first possibility is that Erwin concealed her travel plans from defense counsel. If so, her willingness to conceal that fact from counsel, and hence from the Court, calls into question her credibility as a witness. The second possibility is that Erwin told defense counsel of her plans, and that defense counsel concealed this fact from the Court. If this is the case, it affects the credibility of the attorneys to whom she revealed her plans, given that those attorneys cannot be trusted to be fully truthful with the Court.

statements made during the telephone conference with me regarding the need for the deposition in no way limited the plaintiffs' ability to question the deponent or deponents ... about any matter that would not be subject to any privilege that could be brought by the government.

MS. SPOONER: Except, of course, that transcript [of the December 13 hearing] that I read was from the hearing before the judge, which would obviously supersede our remarks in holding that had occurred.

MR. KIEFFER: Well, that transcript, Ms. Spooner, did not in any way limit. He was stating in that transcript one reason for his need of the depositions before. He did not limit the subject matter of the deposition by his statement.

MS. SPOONER: Actually, he did.

*Id.* at 7–8. The Court does not appreciate defense counsel's attempted usurpation of the Court's role in determining the scope of a deposition that it had ordered to take place. Rule 26(b)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that "[u]nless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows: (1) **In General.** Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party..." The Court did not make any order during the December 13 hearing, or at any other time, that limited the scope of Erwin's deposition further than that prescribed under the Federal Rules. Accordingly, absent a demonstration of mental telepathy, it is not the proper role of defense counsel to expound upon "the basis on which the judge allowed this deposition to go forward" to the Special Master–Monitor and opposing counsel.

### 3. Harassment

 Finally, defendants allege that "[p]laintiffs' counsel engaged in what can only be viewed as an attempt to harass Ms. Erwin by repeatedly asking her the same irrelevant question after she was instructed not to answer by counsel." Defs.' Opp. Br.

at 6. Defendants further assert that "[p]laintiffs' counsel also engaged in what can reasonably be viewed as an attempt to intimidate Ms. Erwin into answering the questions, by making the unfounded accusation that Ms. Erwin was being coached, by asking her to answer the question in her 'personal' capacity, and by asking her if she had obtained private counsel, even though her deposition had been noticed solely as to her official capacity. Following the harassment by Plaintiffs' counsel, Ms. Erwin was visibly and understandably upset." *Id.* (citation omitted).

The transcript of the Erwin deposition shows that after plaintiffs' counsel questioned Erwin for the second time regarding the accuracy of defense counsel's December 17 representations to the Court, defense counsel objected on the grounds of harassment:

MR. BROWN: Let me ask it a different way. You've sat in that courtroom. You heard what was represented to the Court by your attorneys. Were those representations accurate?

MS. SPOONER: I'm going to object on the ground that you are now harassing this witness that I've instructed not to—

MR. KIEFFER: He's not harassing the witness. And she may answer the question. Because it was in public Court.

MS. SPOONER: I am instructing you not to answer that question. Harassment, Mr. Kieffer, is one of the grounds on which an attorney can instruct the witness not to answer.

MR. KIEFFER: I just said he asked a legitimate question to Ms. Erwin.

MS. SPOONER: I understand that.

MR. KIEFFER: And I want Ms. Erwin to answer the question.

MS. SPOONER: And I am instructing her not to answer.

MR. KIEFFER: And you're not her personal counsel and now you're getting into obstruction here.

MS. SPOONER: I beg your pardon?

MR. KIEFFER: I want Ms. Erwin to answer the question. It's a legitimate question. It wasn't an harassing ques-

tion. It was on a matter that was in the public.

MS. SPOONER: I'm instructing her not to answer.

Erwin Dep. at 286–87. The Court first notes that defense counsel's assertion that harassment "is one of the grounds on which an attorney can instruct the witness not to answer" expressly contradicts the Federal Rules of Civil Procedure. Rule 30(d)(1) provides, in relevant part, that "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4)." Neither of these three grounds apply in the present instance.[4]

Defense counsel's answer when asked to define the nature of the alleged harassment is instructive:

MR. BROWN: And what's your definition of harassment?

MS. SPOONER: You are harassing the witness. Can you see how she's reacting to this and you already indicated that how she reacted to the hearing before Judge Lamberth and she's already explained to you that her objection was the way in which the hearing resulted. She felt that the Judge had found she had been dishonest and that she was not dishonest.

This deposition is for you to be—and the Judge specifically agreed with your argument that this deposition was for you to obtain information that was absolutely necessary for you to do your plan.

You have an opportunity to interview and depose this witness after January 6th. This deposition is to obtain information for your plan.

Erwin Dep. at 292. The Court is unable to discern from defense counsel's response anything resembling an explanation as to why

plaintiffs' attempt to solicit an answer to a question that the Special Master–Monitor had determined to be a legitimate question constituted "harassment." It does appear to be the case that Erwin was "visibly and understandably upset" at the close of her deposition. However, the statements made immediately before the end of the deposition seem to belie defendants' assertion that plaintiffs' "harassing" question was the cause of her distress:

MS. SPOONER: Objection. Instruct the witness not to answer on the grounds previously stated.

\* \* \* \* \* \*

MR. BROWN: I don't know those grounds.

MS. SPOONER: Attorney-client privilege and harassment.

MR. KIEFFER: I think it's an appropriate question and I don't think it's harassing. I understand that she is concerned about the question and the answer to it and I think it's an appropriate question.

BY MR. BROWN: When you were sitting in that courtroom, at the end of the hearing, did you have an opinion, yes or no, as to whether or not the Department of Justice was making a misrepresentation to the Court on any subject?

MS. SPOONER: Objection, on the same grounds. Do you notice that the witness is about to cry? Is this what you're proposing to do?

MR. BROWN: It's a yes or no question, Ms. Spooner.

MS. SPOONER: Objection. I instruct the witness not to answer.

*Id.* at 295–96.

The Court first notes that although the Special Master–Monitor observed that Erwin

---

4. Rule 30(d)(4) states, in relevant part, that
[a]t any time during a deposition, on motion of a party or of the deponent and upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy embarrass, or oppress the deponent or party, the court in which the action is pending or the court in the district where the deposition is being taken may order the officer con-

ducting the examination to cease forthwith from taking the deposition, or may limit the scope and manner of the taking of the deposition as provided in Rule 26(c) ... Upon demand of the objecting party or deponent, the taking of the deposition must be suspended for the time necessary to make a motion for an order.

seemed to be "concerned about the question and the answer to it," he did not consider either the line of questioning or the manner in which she was being questioned to be inappropriate or harassing. The Court also notes the absence of any statement by Erwin during the entire line of questioning that she considered the question to be inappropriate or that she believed that plaintiffs' counsel was harassing her. Therefore, the Court surmises that Erwin's apparent distress could have been caused by any number of reasons. It might have been prompted by her inability to address the issue of whether or not defense counsel had misrepresented the nature of his communications with her. It might have been caused by her recollection of a hearing in which her honesty had been called into question. In short, the transcript of the deposition does not lead the Court to conclude that either plaintiffs' inquiry or the manner in which they made their inquiry was improper or constituted harassment.

The Court finds that plaintiffs' line of questioning did not call for privileged information, that their line of questioning sought information relevant to the instant proceedings, and that both the question and the means in which it was asked were proper. Accordingly, the Court will grant plaintiffs' motion to compel.

### B. Motion for Sanctions under Rule 37

 Plaintiffs have also moved to impose sanctions against defendants under Federal Rule of Civil Procedure 37(a)(4)(A). That rule provides, in relevant part, that if a motion to compel disclosure or discovery is granted,

> the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that

the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.

It is well-established that district courts are entrusted with broad discretion to decide whether sanctions under Rule 37 should be imposed, and to determine the nature of any sanctions to be imposed. *Bonds v. District of Columbia,* 93 F.3d 801, 808 (D.C.Cir.1996); *Sturgis v. Am. Ass'n. of Retired Persons,* 1993 WL 518447 (D.C.Cir.1993) (per curiam); *Steffan v. Cheney,* 920 F.2d 74, 75 (D.C.Cir. 1990). The standard of review on appeal of the district court's decision is for abuse of discretion. *Bonds,* 93 F.3d at 808.

 The mandatory language of the Rule dictates that the Court must require the party or deponent, or both, to reimburse the moving party for reasonable expenses incurred in making the motion to compel, unless the Court finds that one of the specified conditions for not making an award exists.[5] In its opposition brief, defendants argue that its assertion of privilege was "substantially justified."[6] After determining the standard under which the Court must assess defendants' argument, the Court will turn to the merits of this argument.

 Prior to 1970, Rule 37(a)(4)(A) provided for sanctions if the court made a determination that the position of the losing party "was without substantial justification." In 1970, the Rule was changed to require the court to administer sanctions unless the losing party's position "was substantially justified." The Advisory Committee Notes explained the rationale behind the amendment:

> The change requires that expenses be awarded unless the conduct of the losing party or person is found to have been substantially justified. The test of "substantial justification" remains, but the change in language is intended to encour-

---

5. As this Court has observed, the "opportunity to be heard" requirement is satisfied by hearing arguments on written submission. *Alexander v. FBI,* 186 F.R.D. 144, 147 n. 1 (D.D.C.1999).

6. Defendants do not claim, nor does the Court find, that there are other circumstances that would render the award of such expenses unjust. Fed.R.Civ.P. 37(a)(4)(A).

age judges to be more alert to abuses occurring in the discovery process.

On many occasions, to be sure, the dispute over discovery between the parties is genuine, though ultimately resolved one way or the other by the court. In such cases, the losing party is substantially justified in carrying the matter to court. But the rules should deter the abuse implicit in carrying or forcing a discovery dispute to court when no genuine dispute exists. And the potential or actual imposition of expenses is virtually the sole formal sanction in the rules to deter a party from pressing to a court hearing frivolous requests for or objections to discovery.

"The Supreme Court has stated that a party meets the 'substantially unjustified' standard when there is a 'genuine dispute' or if 'reasonable people could differ' as to the appropriateness of the motion." *Alexander v. FBI*, 186 F.R.D. at 147 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)); *see also* 8A WRIGHT, MILLER & MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2288 (2d ed.1994) ("Making a motion, or opposing a motion, is 'substantially justified' if the motion raised an issue about which reasonable people could genuinely differ on whether a party was bound to comply with a discovery rule."). "[A] party's position is not substantially justified if there is no legal support for it, if the party concedes the validity of his opponent's position after causing everyone time and money, or, worse, defies an unequivocally clear obligation." *Boca Investerings P'ship v. United States*, 1998 WL 647214 at *2 (D.D.C.1998), *rev'd on other grounds*, 314 F.3d 625, 2003 WL 69563 (D.C.Cir.2003). There is no requirement that the court find that counsel acted in bad faith. *Alexander v. Interim Legal Servs., Inc.*, 1997 WL 732432 (D.D.C.1997) (citing *Devaney v. Continental Ins. Co.*, 989 F.2d 1154, 1162 (11th Cir.1993)). Accordingly, the Court must determine whether reasonable people could genuinely differ as to the merits of defendants' assertion of attorney-client privilege, or whether there could be no genuine dispute because no legal basis for the assertion existed.

In their opposition brief, defendants cite four cases in support of their assertion that "[c]ourts have refused to compel discovery in analogous circumstances where the discovery sought would reveal attorney-client communications." *Id.* at *8. But even a cursory examination of these cases fails to uncover any "analogous circumstances" under which courts have refused to compel discovery.

The first case cited by defendants, *In re Sealed Case*, 737 F.2d 94 (D.C.Cir.1984), involved assertions of attorney-client privilege by corporate counsel during questioning before a grand jury. *Id.* at 96. Corporate counsel refused to answer questions relating to five matters: (1) a disclosure by counsel to the president of the corporation ("the Company") about a conversation that counsel had overheard at a hotel; (2) the bases for certain "hunches" that counsel had formed about the corporation's involvement in bid rigging; (3) a conversation between counsel and a senior executive at a restaurant; (4) two conversations between counsel and the president in the president's office during status reviews of the corporation's legal affairs; and (5) a conversation between counsel and the president aboard an airplane. *Id.* at 97. The D.C. Circuit affirmed the district court's motion to compel with respect to category (1) communications, finding that there was no evidence that confidential client information was exchanged in the conversation. *Id.* at 100. With respect to category (2) communications, the D.C. Circuit also affirmed, stating that counsel "may be asked, and must respond to inquiries, about opinions formed from *direct observations* [he] made . . ., coupled with other *non-confidential information* [he] may possess[.]" *Id.* at 100 (emphasis in original). The court also affirmed the district court's finding that category (3) communications were privileged because the senior executive had sought counsel's legal advice and because the matters discussed concerned confidential client information. *Id.* at 101. With respect to category (4) communications, the court found that counsel had rendered legal advice during his meetings with the president, based in part on confidential client information previously disclosed to him. *Id.* As to category (5) communications, the court

found that the circumstances surrounding the conversation at issue were consistent with an intention to preserve confidentiality. *Id.* at 102. This Court is unable to discern any similarity to the instant case, in which Erwin was asked about representations made by Justice Department counsel, not her personal counsel, regarding non-confidential communications that did not involve the securing of legal advice.

In the second case cited by defendants, *Alexander v. FBI*, 186 F.R.D. 21 (D.D.C. 1998), plaintiffs' counsel deposed Stacey Parker, assistant to Paul Begala, counselor to the President of the United States. *Id.* at 47. During the deposition, government counsel invoked attorney-client privilege in response to questions about whether Parker's attorney had instructed her how she might search for documents in response to plaintiffs' subpoena duces tecum, whether her attorney "went through each document" with her, and whether she had discussed Begala's deposition testimony with her attorney. *Id.* This Court upheld counsel's assertion of the privilege, on the grounds that the answers to these questions would have revealed confidential attorney-client communications conveying legal advice that Parker's attorney had given her to prepare her for her deposition. *Id.* Defendants' assertion that Parker's communications with her attorney in *Alexander* are somehow "analogous" to a series of non-confidential communications discussing Erwin's time schedule during the month of December, which were not made for the purpose of securing legal advice, is simply preposterous. As this Court declared in *Alexander*, "the mere fact that an individual communicates with an attorney does not make the communication privileged." *Id.* at 45.

Nor does *Boyer v. Bd. of County Comm'rs*, 162 F.R.D. 687 (D.Kan.1995), present a situation analogous to the instant case. In *Boyer*, which involved a county employee's claim of constructive discharge, the county attorney held a private conference with the plaintiff's immediate supervisor just before her deposition. *Id.* at 690. The purposes of the pre-deposition conference were to learn about the supervisor's knowledge of relevant facts, and to prepare the supervisor for her deposition. *Id.* During the supervisor's deposition, plaintiffs' counsel told the supervisor: "Since [defense counsel] said that you are not a representative of the county I'm entitled, at least in my opinion, to ask about what you two talked about. Can you tell me what you talked about with her?" *Id.* at 688. The district court upheld the county attorney's assertion of attorney-client privilege, explaining that although the plaintiff was entitled to find out what the supervisor knew about the facts of the case, she was not entitled to enquire into the confidential communications that transpired between the supervisor and the county attorney during the pre-deposition conference. *Id.* at 690. There is not even a remote similarity between confidential attorney-client communications made in order to prepare a witness for her deposition and run-of-the-mill discussions involving Erwin's availability for deposition during the month of December.

Defendants' final "authority" is a footnote from *Nakajima v. Gen. Motors Corp.*, 857 F.Supp. 100 (D.D.C.1994), in which the plaintiffs moved to compel deposition testimony about the substance of conversations between defense counsel and a former employee of the defendant. The footnote explains that the employee "retained Kirkland & Ellis as counsel on April 14, 1993, to represent him at the April 15, 1993, deposition. Of course, any communications from April 14 onward between [the employee] and his counsel in preparation for the deposition are protected by the attorney-client privilege and are not discoverable." *Id.* at 105 n. 11. But the instant case has nothing to do with confidential attorney-client communications made for the purpose of preparing a client for his or her deposition. Nevertheless, it is interesting that defendants chose to omit the fact that the court in *Nakajima* actually *granted* plaintiffs' motion to compel because the attorney-client privilege did not protect the conversations:

[D]efendant has not alleged that [the former employee] was aware that he was being questioned at the meeting in order for defendant to obtain legal advice or that the communications were considered confidential when made. Therefore, the attor-

ney-client privilege does not protect communications made at the Pontiac meeting. Accordingly, plaintiffs' motion to compel further deposition testimony is granted. *Id.* at 104–05.

In short, defendants have pointed to no authority demonstrating that "[c]ourts have refused to compel discovery in analogous circumstances" to the instant case. Furthermore, the Court strongly disagrees with the assertion that reasonable people could differ as to whether a series of communications that were not made for the purpose of securing legal advice, that were not made in order to prepare a client for her deposition, that related solely to Erwin's schedule and her availability for being deposed, and the substance of which were disclosed by defense counsel in open court fell within the scope of information protected under the attorney-client privilege. At the very least, it is ridiculous to assert that reasonable people could differ as to whether a simple yes or no answer to the factual question "Did government counsel make any misrepresentations to the Court during the December 17 hearing?" would disclose the contents of any confidential communications between Erwin and defense counsel made for the purpose of securing legal advice or services. In short, defendants have failed to provide any evidence that their repeated objections were "substantially justified."

■ Accordingly, this Court will grant plaintiffs' motion for sanctions under Rule 37(a)(4)(A). The only issue that remains is whether sanctions should be assessed against defendants, against defense counsel, or both. Plaintiffs have requested that the Court impose sanctions against defense counsel personally, and bar reimbursement from the government. Pls.' Mot. at 15.[7] Defendants respond that the conduct of defense counsel "come[s] nowhere near the type of conduct that could justify imposing personal sanctions" against her Defs.' Opp. Br. at 17.

The Court disagrees with defendants' characterization of the seriousness of defense counsel's misconduct. In the course of a deposition ordered by this Court, defense counsel repeatedly made groundless assertions of attorney-client privilege and ignored the finding of the Special Master–Monitor that plaintiffs' questions were appropriate. Additionally, defense counsel repeatedly attempted to restrict the scope of plaintiffs' questioning by asserting, without any basis in fact, that the Court had only permitted the deposition to proceed based on its assumption that plaintiffs' questions would be limited to inquiry into "facts that go to the creation of plaintiffs' plans." What the Court finds most disturbing about the conduct of defense counsel, however, is not just that she *directed a government official not to answer proper questions*, but also that she obstructed a legitimate inquiry into whether her co-counsel had lied to the Court. This obstruction is made more repugnant by the fact that defense counsel is not only an officer of the court, but a representative of the Department of Justice. It has been observed that "[g]overnmental attorneys should model the ideals of integrity and ethics rather than attempt to circumvent them." *Chilcutt v. United States,* 4 F.3d 1313, 1327 n. 36 (5th Cir.1993). Instead, the conduct of defense counsel in this matter makes a mockery of all that the Department of Justice stands for.

However, the discovery abuse committed by defense counsel was only compounded by her superiors at the Justice Department, who not only condoned her improper behavior, but proceeded to file a nineteen-page meritless memorandum that defended her conduct. By filing an unmeritorious opposition brief, the Justice Department has attempted to cover up whether its own attorneys have yet again deliberately provided false information to this Court. The lack of judgment demonstrated by this action suggests to the Court that something has gone seriously awry in the Justice Department's handling of this litigation. An agency that can engage in this kind of attempted coverup has clearly lost

---

7. Plaintiffs also seek imposition of sanctions against Erwin. However, the transcript of the Erwin deposition does not indicate, and plaintiffs have not demonstrated, that Erwin's "conduct necessitated the motion" to compel, a requirement under Rule 37(a)(4)(A) in order for the Court to impose discovery sanctions against a deponent.

any sense of perspective about the way in which this litigation should be conducted.

The leading commentators on federal procedure have noted an "increasing interest [by federal courts] in imposing a sanction against the attorney where the fault is counsel's rather than imposing the ultimate sanction against his or her client." 8A WRIGHT, MILLER & MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2284 (2d ed.1994). The Court sees no reason why taxpayers should foot the burden of remedying the harm to plaintiffs caused by the unjustifiable conduct of government attorneys. Accordingly, the Court will order sanctions to be imposed against defense counsel personally, together with the Justice Department attorneys who filed the meritless opposition brief that defended her conduct.

However, the Court will not bar the United States from reimbursing these attorneys. It is true that sufficient precedent exists for this Court to do so. *See, e.g., Chilcutt,* 4 F.3d at 1325–27 (ordering government counsel to pay all costs, including attorney's fees, that plaintiffs had incurred in preparing their motions to compel and for sanctions, and forbidding counsel to seek reimbursement from the government); *United States v. Sumitomo Marine & Fire Ins. Co., Ltd.,* 617 F.2d 1365, 1370 (9th Cir.1980) (assessing Rule 37 sanctions against government counsel personally); *United States v. Shaffer Equipment Co.,* 158 F.R.D. 80, 88 (S.D.W.Va. 1994) (assessing Rule 26 sanctions against government counsel and barring reimbursement from the government). But the Court will not interfere with the policy decisions of the executive branch of government. Instead, it will leave it up to the executive branch to decide whether or not it wishes to indemnify the Justice Department attorneys for their repugnant behavior.[8]

### III. CONCLUSION

For the reasons stated above, it is hereby

ORDERED that plaintiffs' motion to compel [1698–1] be, and hereby is, GRANTED. It is further

ORDERED that plaintiffs' motion for sanctions pursuant to Rule 37(a)(4)(A) [1698–2] be, and hereby is, GRANTED. It is further

ORDERED that Acting Special Trustee Donna Erwin be deposed by plaintiffs at a time and place determined by plaintiffs, and that she shall respond to the questions set forth in plaintiffs' above-mentioned motion to compel, and all other questions related to the subject matter of those questions. It is further

ORDERED that defense counsel Sandra P. Spooner, Assistant Attorney General Robert D. McCallum, Deputy Assistant Attorney General Stuart E. Schiffer, and Justice Department attorneys J. Christopher Kohn, John T. Stemplewicz, and Timothy E. Curley personally shall pay to plaintiffs all reasonable expenses, including attorney's fees, incurred in making plaintiffs' motion to compel. It is further

ORDERED that defense counsel Sandra P. Spooner, Assistant Attorney General Robert D. McCallum, Deputy Assistant Attorney General Stuart E. Schiffer, and Justice Department attorneys J. Christopher Kohn, John T. Stemplewicz, and Timothy E. Curley personally shall pay to plaintiffs all reasonable expenses, including attorney's fees, incurred as a result of having to re-depose Donna Erwin. It is further

ORDERED that within thirty (30) days of the date of the completion of the deposition ordered herein, plaintiffs shall submit to the Court an appropriate filing detailing the amount of reasonable expenses and attorneys' fees incurred as a result of making plaintiffs' motion to compel and having to re-depose Donna Erwin. Plaintiffs shall also serve defense counsel Sandra P. Spooner, Assistant Attorney General Robert D. McCallum, Deputy Assistant Attorney General Stuart E. Schiffer, and Justice Department attorneys J. Christopher Kohn, John T.

---

8. Because the Court, at this point, does not know whether the misrepresentations of fact by defense counsel regarding the availability of Donna Erwin for being deposed in December were de-liberate misrepresentations, it will defer ruling at this time whether this matter should be referred to the Disciplinary Panel.

Stemplewicz, and Timothy E. Curley with copies of this filing. Any response to this filing shall be submitted to the Court within thirty (30) days thereafter. It is further

ORDERED that defendants' motion to strike [1760] be, and hereby is, GRANTED with respect to plaintiffs' January 28, 2003 reply brief in support of their motion to compel the testimony of Donna Erwin.

SO ORDERED.

